UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
CLIFFORD DALE FOX,
    Debtor.     No. 7-06-10690 SL

KIERAN RYAN, TRUSTEE,
    Plaintiff,
v.     Adv. No. 06-1189 S
CLIFFORD DALE FOX,     Consolidated with:
    Defendant.

UNITED STATES TRUSTEE,
    Plaintiff,
v.     Adv. No. 06-1190 S
CLIFFORD DALE FOX,
    Defendant.

**MEMORANDUM OPINION IN SUPPORT OF**
**<u>JUDGMENT DISMISSING COMPLAINTS WITH PREJUDICE</u>**

These adversary proceedings were brought by the trustee and the Office of the United States Trustee respectively to deny the debtor a discharge pursuant to section 727(a)(3), (a)(4) and (a)(5).[1] The Court has jurisdiction of the subject matter and of the parties pursuant to 28 U.S.C. §§1334 and 157(a), this is a

---

[1] The relevant portions of this statute provide as follows:
The court shall grant the debtor a discharge unless --
(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and payments, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case;
(4) the debtor knowingly and fraudulently, in or in connection with the case --
    (A) made a false oath or account;...
(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to the debtor's liabilities....

Case 06-01189-s    Doc 39    Filed 10/26/07    Entered 10/26/07 13:12:32 Page 1 of 14

core proceeding under §157(b)(2)(J), and these are findings of fact and conclusions of law as required by Rule 7052 F.R.B.P.

The Court finds and concludes that Plaintiffs have not convinced the Court, by a preponderance of evidence, that Debtor violated any of the three subsections of §727(a). Therefore the consolidated complaints will be dismissed.[2]

Debtor filed his petition on May 1, 2006. Following three §341 meetings (the middle one of which Debtor missed) and a subsequent deposition, both the case trustee and the Office of the United States Trustee filed adversary proceedings objecting to Debtor's discharge.

Plaintiffs' trial presentations were based primarily on two congeries of evidence, in addition to Debtor's statement of financial affairs ("SOFA") and schedules: checks for $39,797.19 paid by Russel F. Ahrens, Jr. to Debtor in calendar year 2005 (Trial Exhibit 5) and bank statements confirming that those sums had been received by Debtor (Trial Exhibit 6), and loan applications submitted to Bank of the Southwest which claimed ownership of two properties in Santa Fe and $200,000 worth of

---

[2] This is not to say that the complaints should not have been brought; like so many bankruptcy matters, what appeared to be a flagrant violation of the Code has turned out to be, on closer inspection, an incidence probably of sloppiness rather than fraud. A more searching inquiry in preparing the case for filing might have avoided this adversary proceeding altogether. Debtor had different counsel for his bankruptcy filing than for this adversary proceeding.

Case 06-01189-s    Doc 39    Filed 10/26/07    Entered 10/26/07 13:12:32 Page 2 of 14

tools (Trial Exhibits 7, 8 and 9).[3] Plaintiffs argued that Debtor's failure to disclose the Ahrens payments constituted a false oath. They also argued that the failure to have available the invoices for materials and labor that Debtor sent to Ahrens for further payments was a failure to keep records, as was the Debtor's nonproduction of his 2004 tax return at his deposition. Similarly, Plaintiffs argued that Debtor made a false oath when he failed to disclose the Santa Fe properties and the tools, and that he had failed to explain satisfactorily the loss of these assets. Plaintiffs also asserted generally that Debtor had failed to honor the overarching commands of transparency and integrity, which together with accountability, constitute the three bedrock values of the Bankruptcy Code and bankruptcy practice.

Trial Exhibit 1 is comprised of Debtor's schedules and SOFA. His schedule A lists a single property on North Date Street in Truth or Consequences, New Mexico, which is both his primary residence and a commercial property, the latter apparently by virtue of renting out a portion of the building on a month-to-month tenancy to a barber shop. (Trial Exhibit 2 includes a copy of Debtor's amended schedule I, disclosing $150 of monthly income

---

[3] Debtor renewed his objection to the admission of these latter three exhibits on the grounds that they are inadmissible character evidence. Fed.R.Evid. 404. Given the disposition of this adversary proceeding, the Court need not rule on the objection.

from the rental.)  Schedule B states "none" for virtually all the categories, including for category 29 ("Machinery, fixtures, equipment, and supplies used in business").  For category 33 ("Other personal property of any kind not already listed. Itemize.") Debtor listed "hand tools" valued at $2,000.[4]

In his SOFA, Debtor answered question 1 ("Income from employment or operation of business") with "$9,000 Wages 2004; $8,500 Odd jobs 2005; $900 Odd jobs 2006".  He answered "none" to question 2 ("Income other than from employment of operation of business"), although after the §341 meeting, Debtor amended schedule I to list $150 per month in rental income from the barber shop.  He answered "none" to question 19(d) ("List all financial institutions...to whom a financial statement was issued by the debtor....").

In making its decision, the Court is governed by "the requirement that the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the [objecting parties]."  Gullickson v. Brown (In re Brown), 108 F.3d 1290, 1293 (10th Cir. 1997 ).  (Citation omitted.)

Plaintiffs established that Debtor had submitted to Bank of the Southwest three different loan applications, the first of

---

[4] For category 7 ("Furs and jewelry"), Debtor listed "usual jewelry" valued at $1,000.  Since it was not germane to the case, there was no evidence about what the "usual jewelry" would be for a middle-aged divorced male in the construction industry.

which (Trial Exhibit 7) listed and valued the two Santa Fe properties at $675,000 and the third of which (Trial Exhibit 9) claimed monthly rental income from the properties of $1,400. The bank officer testified that the bank verified (or attempted to verify) Debtor's employment income for the three applications. The bank did not require proof of ownership of the properties nor of the ownership or valuation of the tools; it nevertheless made the loans. No direct evidence of the ownership of the property, such as a deed, nor of the value of the tools (whatever that evidence might be), was offered. Debtor testified that he took out the loans because he wanted to finance a home for himself and get (re)started in his business and on his life. (As Debtor put it, Willy-Sutton style[5], the idea behind applying for a loan is to get the money.) It is abundantly clear to the Court that Debtor lied on the loan applications; Debtor never owned the Santa Fe real estate, and almost certainly Debtor's valuation at $2,000 in Schedules B and C is the real value of the tools. Conceivably there was a dischargeability action for the bank in these circumstances; there is no basis for an objection to discharge.

There was no question that Debtor received the $39,797.19

---

[5] Legend, and perhaps the facts, have it that Sutton, a prominent 1930's bank robber, was asked, upon being arrested, why he robbed banks. "Because that's where the money is" was the response.

from Ahrens in CY 2005. That he was subsequently sued by Ahrens to recover all the payments, despite Debtor's having done all the work and supplied all the materials, and that Ahrens obtained a default judgment for $39,547.00 in April 2006 (Trial Exhibit 3), is irrelevant.[6]

Debtor explained that he had not treated the payments he received from Ahrens as gross income, either on his 2005 tax return or in his SOFA, because he understood that it did not need to be treated as income until the job was finished. The last payment received was a check on December 18, 2005. Debtor also testified, without dispute, that Ahrens still owed him approximately $8,000, that he sued Ahrens in small claims court for that amount but the action was dismissed because he did not have his contractor's license, that Ahrens then sued him in district court and obtained the default judgment, which led Debtor to file his bankruptcy petition on May 1, 2006. Thus, under Debtor's theory, there would have been no need to report to the IRS the Ahrens payments in his 2005 return. (Debtor

---

[6] This harsh result was completely legal because before Debtor began the work, he had lost his general contractor's license. See NMSA §60-13-30(A) (Repl. Pamp. 2004) (repealed effective July 1, 2006) (contractor may not bring an action for compensation without proof of a contractor's license); Triple B. Corporation v. Brown & Root, Inc., 106 N.M. 99, 100, 101 (1987), 739 P.2d 968, 970, 971 ("[The statute] clearly bars suits by unlicensed contractors even when they seek compensation for construction work fully and satisfactorily performed..... Its policy must override the judicial principle that disfavors unjust enrichment." (Citation omitted.))

Case 06-01189-s    Doc 39    Filed 10/26/07    Entered 10/26/07 13:12:32 Page 6 of 14

testified his 2006 return had not been filed as of the trial date.)

The Court on its own motion takes judicial notice of the adjudicative fact, F.R.Evid. 102, that an acceptable and commonly used accounting method for contracts such as these, as an alternative to accounting for the income, expenses and profit year by year, is to wait until the entire project is completed to provide the complete accounting for gross income received, expenses paid and profit or loss. This is not part of Generally Accepted Accounting Principles (GAAP) but it is part of Other Comprehensive Basis of Accounting (OCBOA). Thus, Debtor's understanding of how to account for and report the Ahrens' payments, at least for accounting and IRS tax purposes, is reasonable and believable.

On the other hand, the demand of SOFA 1 admits of less sophistication or choice; it requires the disclosure of "the gross amount of income the debtor has received from employment, trade or profession, or from operation of the debtor's business...." This is a fairly straightforward demand. Assuming that Debtor in fact read the question carefully at some point before signing the SOFA and testifying under pain of perjury (as this Court does assume, regardless of whether it is true or not), Debtor should have been on notice that the accounting method he used for his 2005 IRS return would not work for his bankruptcy

Case 06-01189-s    Doc 39    Filed 10/26/07    Entered 10/26/07 13:12:32 Page 7 of 14

disclosure.

The bankruptcy standard also includes, however, a consideration of whether the debtor "knowingly and fraudulently" made a false oath. "To trigger section 727(a)(4)(A), the false oath must relate to a material matter and must be made willfully with intent to defraud." Job v. Calder (In re Calder), 907 F.2d 953, 955 (10th Cir. 1990).

In this instance, the Court does not find it more likely than not that Debtor's failure to list and testify at the §341 meetings about the Ahrens' payments was the result of Debtor's intent to deceive as opposed to what was likely a good-faith misunderstanding. Neither side called as a witness the attorney that Debtor employed to file his bankruptcy case, so it is not clear what preparation that office did or whether Debtor was instructed on the more simplistic standard of disclosure imposed by SOFA 1. And while it is clear to experienced bankruptcy practitioners, such as all the counsel in this case, that SOFA 1 required disclosure of the Ahrens payments, the Court cannot assume that, in these particular circumstances, it would be obvious to Debtor that accepted accounting standards and IRS reporting standards would differ from what SOFA 1 required. If Debtor in good faith believed that he did not need to list the Ahrens' payments, then justifiably he could believe he did not need to testify about them (assuming he was even thinking about

the payments) during the §341 meetings.  And Debtor's demeanor and presentation during the trial confirmed for the Court that Debtor was acting and testifying in good faith on this score.[7]

Plaintiffs also charged Debtor with failing to maintain records, specifically in connection with the invoices for materials (and perhaps subcontract labor) for the Ahrens job. Debtor testified that he had sent Ahrens the invoices he had when he was trying to collect the last $8,000, and had not kept copies for himself, so he did not have them.  While it is certainly not the obligation of the trustee or the Office of the United States Trustee to collect documents on behalf of a debtor, Plaintiffs were in direct contact with Ahrens' attorney in obtaining the checks that Ahrens wrote to Debtor.  Presumably Plaintiffs could easily have obtained the invoices as well (or confirmed that few or no invoices existed) if it were likely that the existence or

---

[7] In his deposition, Debtor was confronted with the two varying figures for his CY 2005 income and asked whether if the larger figure was correct, then the smaller figure he actually reported must have been "false".  Debtor agreed.  In this context, "false" could have meant merely incorrect, or it could have meant not true accompanied by an intention to deceive. Compare Webster's Ninth New Collegiate Dictionary (1991) 447 definition 3 ("not true [~ concepts]") with definition 2a ("intentionally untrue [~ testimony]").  Plaintiffs did not follow up in the deposition or at trial to confirm which meaning of "false" Debtor was using, although the Debtor testified at trial that at the time he swore to the accuracy of his schedules and SOFA, and at the time he was testifying under oath, he believed he had been accurate.  Based on Gullickson v. Brown and on Debtor's testimony, the Court cannot assume that Debtor had an intention to deceive.

not of the invoices would shed much light on the disposition of the Ahrens payments. In any event, what documents a debtor should be expected to have on hand during the bankruptcy case depends greatly on the circumstances of the debtor.

> The scope of the debtor's duty to maintain records depends on the nature of the debtor's business and the facts and circumstances of each case. One authority explains as follows: The debtor's obligation to present records of financial information is intended to protect the trustee and creditors by enabling them to determine or confirm the debtor's financial condition and the cause of the debtor's financial difficulty....
> ....
> There are cases in which no duty to keep books arises; in general, consumer debtors have no obligation to keep books. On the other hand, a debtor who is a sophisticated business person will be held to a higher level of accountability in record keeping. If the nature and extent of the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, the debtor must show that because of unusual circumstances there was no duty to keep them.
> 6 Collier on Bankruptcy ¶ 727.03[3][a],[b] (Lawrence P. King ed., 15th ed. rev. 1998) (footnotes omitted). The court in Keystone Automotive Warehouse, Inc. v. LaBonte (In re LaBonte), 13 B.R. 887, 892 (Bankr.D.Kan.1981), quoted the rule long recognized in the Tenth Circuit that:"Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them." Hedges v. Bushnell, 106 F.2d 979, 982 (10th Cir.1939). See Johnson v. Bockman (In re Bockman), 282 F.2d 544, 546 (10th Cir.1960) (same).

Bailey v. Ogden (In re Ogden), 251 B.R. 441, 1999 WL 282732, at 6 (10th Cir. B.A.P. 1999) (Table) (unpublished decision). In this instance, with Debtor apparently operating on a shoestring and not even having a contractor's license, it is not surprising that

he had relatively little in the way of documents.  Debtor also testified that when he was still married, his wife was the bookkeeper for his business, and that he had an accountant for taxes.  Debtor appears to be one of a myriad of sole proprietors running small businesses, who may be very good at the production or service side of the business but who are sorely lacking on the paperwork side.  Debtor's was not a major business case; it was much closer to being a mere consumer case.[8]

Debtor admitted that he had been requested to bring to his deposition his 2004 tax return but did not do so.  Whether this behavior rises to the level of a violation of the §727(a)(3) or whether it should be treated essentially as a failure of discovery is the issue.  As reflected in its current form Order Arising out of Initial Pretrial Conference, the Court generally expects that discovery disputes will be resolved during the

---

[8] Plaintiffs also argued that, once the various omissions (including the failure to list the Ahrens payments) came to light, Debtor should have amended his schedules and answers to SOFA.  (He did amend schedule I to show the barbershop rental income, but failed to amend his answer to SOFA 2 to show that income and some other income.)  One would have expected Debtor's bankruptcy counsel to see to it that that was done.  And there was no evidence that the trustee requested an amendment.  But beyond that, "once the cat was out of the bag, so to speak, we do not believe that failing to amend the schedules to list no-longer-hidden assets can indicate that the original omission was knowing and fraudulent."  Sloan v. Tirey (In re Tirey), 271 B.R. 213 (Table), 2001 WL 963996 at *3 (10th Cir. B.A.P. 2001) (unpublished decision).

discovery period or at a final pretrial conference.[9] Thus, even though in this case there were not the usual pretrial orders entered, Plaintiffs should have addressed the failure to produce the tax return to the Court in the context of a motion to compel production. Then, if Debtor persisted in an unjustified refusal to produce the return, the Court could have taken action at that time. And that action could have included the sanction of defaulting Debtor on the merits. The mere fact of non-production, devoid of any background for the non-production (including whether the non-production was deliberate and avoidable), does not support a finding of a violation of the requirement to maintain records.

The charge that Debtor failed to explain satisfactorily the loss of assets was also not supported at trial. It seems clear that much if not all of the $39,797.19 had gone for materials and perhaps payments to subcontractors; indeed, Debtor was still owed about $8,000, which he never received. Unless this was an unusually lucrative contract for Debtor, it is unlikely that there was so much profit in the contract that it would have constituted a material fund of cash to repay creditors.

In a related vein, the bank statements, including the copies of checks and deposit slips, show many checks made out to "Dale

---

[9] The form is available at www.nmcourt.fed.us/usbc/forms-attorney.

Fox" (Debtor). Debtor explained that after he bounced a check or two at Home Depot, he had to start dealing in cash with them for building supplies. The last check made out to Home Depot is no. 111, dated November 11, 2004, which corroborates Debtor's testimony. While there were what appears to the Court to be a relatively large number of checks in the mid-three-figures range made out to Debtor, there was no evidence presented that Debtor was wasting these funds. If anything, Debtor appears to have conducted a number of transactions in cash (although there was no evidence presented of what Debtor's monthly credit card expenditures were), which by itself does not offend the statute.

The same applies in spades to the charge that Debtor failed to explain the loss of the Santa Fe real estate and the $200,000 worth of tools. Since Debtor never owned them (or, in the case of the tools, since Debtor's tools were never worth that sum), there was no loss to explain.

Plaintiffs were absolutely correct to emphasize the values of transparency and integrity which should inform every debtor's invocation of the Code. These principles are foundational.[10] Nevertheless, in this instance these values are adequately

---

[10] "And isn't it ironic, at the end of the day, that the bankruptcy system has so much to say to the larger marketplace about integrity, transparency and accountability?" Leif Clark, Dicta: Conflicts of Interest, ABI Journal, Vol 21, No. 3 (April 2002), at 37. The context of the article was the then-ongoing disclosures of corporate and personal wrongdoing in cases such as Enron, HealthSouth, Adelphia, etc.

Case 06-01189-s   Doc 39   Filed 10/26/07   Entered 10/26/07 13:12:32 Page 13 of 14

expressed in the specific provisions of the Code. The fact that Debtor has not violated any provisions of §727, coupled with his straightforward presentation about the facts surrounding his filing, lead the Court to conclude that Debtor has also not violated the principles of transparency or integrity.

For the foregoing reasons, the Court finds and concludes that there has been no violation of §727(a). The Court will therefore enter a judgment dismissing with prejudice the complaints.

/s/ James S. Starzynski
James S. Starzynski
United States Bankruptcy Judge

COPY TO:

R Trey Arvizu, III
PO Box 1479
Las Cruces, NM 88004-1479

Kieran F Ryan
Ryan Law Office
PO Box 26
Las Cruces, NM 88004-0026

Leonard K Martinez-Metzgar
PO Box 608
Albuquerque, NM 87103-0608